UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

_____

LAWRENCE ZIMMERMAN,

                                              Plaintiff,

              v.                                              3:06-CV-0557
                                                              (LEK/GJD)

COMMISSIONER OF SOCIAL SECURITY,

                                              Defendant.

_____

PETER W. HILL, ESQ., Attorney for Plaintiff
SANDRA M. GROSSFELD, Asst. U.S. Attorney for Defendant

GUSTAVE J. DIBIANCO, Magistrate Judge

## REPORT-RECOMMENDATION

This matter was referred to me for report and recommendation by the Honorable
Lawrence E. Kahn, United States District Judge, pursuant to 28 U.S.C. § 636(b) and
Local Rule 72.3(d).

## PROCEDURAL HISTORY

Plaintiff filed an application for disability insurance benefits on August 16,
2004. (Administrative Transcript ("T.") at 42-45). The application was denied
initially (T. 21-24), and plaintiff requested a hearing (T. 25). A hearing was held
before an Administrative Law Judge ("ALJ") on October 12, 2005 (T. 255-80). In a
decision dated November 14, 2005, the ALJ found that plaintiff was not disabled. (T.
11-18). The ALJ's decision became the final decision of the Commissioner when the
Appeals Council denied plaintiff's request for review on March 27, 2006. (T. 4-7).

**CONTENTIONS**

The plaintiff makes the following claims:

(1) The ALJ's finding that plaintiff can perform light work is not supported by substantial evidence. (Brief at 8-12)(Dkt. No. 6).

(2) The defendant failed to sustain his burden of proof to show that there are jobs available in the national economy that plaintiff can perform. (Brief at 13-15).

(3) The ALJ failed to properly assess plaintiff's credibility. (Brief at 15-18).

**FACTS**

**A.  Non-Medical Evidence and Testimony**

Plaintiff, who was 49 years old at the time of the ALJ's hearing, is a high school graduate and is attending community college. (T. 258, 274).  Plaintiff worked as a tractor trailer driver from 1990 to 1999. (T. 260).  Plaintiff testified that in December of 1999, he was unloading a trailer when he stepped over a pallet the wrong way, injuring his lower back. (T. 262).  Plaintiff further testified that he has attempted to go back to work a couple of times but has had to leave a short time later because of the pain from his injuries. (T. 261, 276-77).

At the hearing, plaintiff testified that he is in pain 24 hours a day, 7 days a week. (T. 264).  Plaintiff describes shooting pains in his lower back and pain in his feet which causes a burning sensation. (T. 264-65).  Plaintiff testified that he takes three medications: prescription strength ibuprofen, Neurontin, and Nexium. (T. 265). He testified that he takes the Nexium to offset the stomach problems caused by the ibuprofen and Neurontin. (T. 265).  When asked what other side effects he has been

2

experiencing from the medicine, plaintiff testified that the Neurontin makes him tired and dizzy. (T. 265).  Plaintiff also testified that he uses a TENS unit. (T. 277). Although plaintiff has seen several doctors since his injury in 1999, he testified that Dr. Masarech has been the only doctor he has been seeing in the past two to three years. (T. 265-266).

When asked about his physical capabilities, plaintiff testified that he is able to stand for approximately 15 to 30 minutes and walk for approximately half a mile. (T. 266).  He elaborated that although he can do the above activities, he is constantly in pain while doing them. (T. 266).  He stated that he has to sit down for approximately 15 to 20 minutes before he can continue walking or standing since his feet get sore and feel as if they are burning. (T. 266).  Plaintiff testified that he has been able to sit for as long as two hours in a class if given the opportunity to get up and move around. (T. 266-67).  He stated that he can bend, although it is difficult for him. (T. 267). Plaintiff testified that if he needs to lift something, he can squat. (T. 267).  When asked the heaviest weight he can lift, plaintiff testified that he can lift 20 to 30 pounds. (T. 267).

With regard to his daily activities, plaintiff testified that his wife does most of the grocery shopping, but he goes with her once in a while and occasionally helps her carry the groceries in the house.  (T. 267).  He further testified that he helps with the preparation of meals and cooking.  (T. 268).  However, he does not help clean the house or do the laundry.  (T. 269).  Plaintiff testified that he mows his front lawn with the use of a "walk behind" power mower.  (T. 269).  He testified that he also goes to

church every Sunday, and he has a hard time sitting through the service without getting up and walking around. (T. 270).  Plaintiff also testified that he occasionally hunts and fishes. (T. 271).  He also goes to school approximately 4 to 5 days a week and is in class for approximately 3 to 4 hours a day. (T. 273).

## B. Medical Evidence

On December 20, 1999, plaintiff was examined by Dr. Kiran A. Talari. (T. 77-79).  Dr. Talari found tenderness in plaintiff's right lumbosacral region and some minimal right paraspinous muscle spasm. (T. 77).  Straight leg raising was negative bilaterally. (T. 77).  Deep tendon reflexes were 2 out of 2, and power was 5 out of 5. (T. 77).  Plaintiff's gait was "minimally limping" on the right side, but sensation was normal in both lower extremities. (T. 77).  Dr. Talari diagnosed acute lumbar strain with a history of herniated nucleus pulposis at L4-5.[1]  Dr. Talari advised plaintiff to stop taking Motrin and prescribed Relafin and Flexaril. (T. 78).  He also advised plaintiff to "start with light duty activity." (T. 78).  Dr. Talari also recorded plaintiff's statements that walking, bending, lying down, and standing for a long time increased his pain.  (T. 79).

On March 7, 2000, plaintiff was sent by the Workers' Compensation Board to Dr. Edward Sugarman for a consultative orthopedic evaluation. (T. 81-83).  Dr.

---

[1] The court notes that this statement by Dr. Talari appears to be based on an MRI that plaintiff had on November 19, 1999, prior to the injury that he alleges caused his disability. *See* (T. 81).  When plaintiff underwent a consultative examination by orthopedist Dr. Edward Sugarman at the request of the Workers' Compensation Board on March 7, 2000, Dr. Sugarman also recited this history in his report. (T. 81-83).  The November 1999 MRI appears at page 99 of the transcript.

Sugarman noted that plaintiff had previously been injured in a motor vehicle accident in 1998. (T. 81).  During the March 2000 examination, plaintiff reported that the pain was receding from his leg and was only in his lower back. (T. 82).

Dr. Sugarman stated that plaintiff's pain had improved considerably with the use of aqua therapy, plaintiff was planning on starting an exercise program, and hoped to be back to work by April of 2000. (T. 82).  Dr. Sugarman's diagnosis was L5-S1 herniated disc, related to the 1998 auto accident and made worse by the 1999 injury.  However, Dr. Sugarman stated that the prognosis was good. (T. 82).  Dr. Sugarman stated that once plaintiff was "through this episode," he would be able to resume his "usual duties." (T. 83).

On June 13, 2000, plaintiff underwent another MRI of his lumbar spine by Dr. Lawrence J. Rosenblum. (T. 98).  Dr. Rosenblum conclued that plaintiff had "a mild central diffuse diskal bulging of the L5-S1 intervertebral disk with an annular rent." (T. 98).  According to Dr. Rosenblum, the "annular rent in the posterior annulus ... can be a pain generator." (T. 98).  However, when he compared the June 13, 2000 MRI with a November 1999 MRI, Dr. Rosenblum stated that there had been "considerable diminution of the asymmetric bulging of the L5-S1 disk, and that there was no longer any significant nerve impingement. (T. 98).

On May 10, 2001, plaintiff was examined by Dr. Ronald A. Naumann.  (T. 93-95).  Dr. Naumann's impression was that plaintiff suffered from a chronic lumbosacral strain, and although there had been a disk herniation, it "apparently spontaneously resolved."  (T. 93).  In Dr. Naumann's opinion, plaintiff could not return to his

5

previous work as a truck driver but "***could return to some kind of light duty***." (T. 93)
(emphasis added). The results from the physical examination showed that plaintiff
walked without a limp; plaintiff could "bend forward from the vertical to 90 degrees
with a normal reversal of his lordotic curve"; could laterally bend without restrictions;
straight leg raising was negative to 90 degrees in the sitting position; and plaintiff had
excellent strength in his legs with normal sensation and reflexes. (T. 94).

  On May 15, 2001, plaintiff underwent a functional capacity evaluation ("FCE")
conducted by Terri A. Seager, an occupational therapist and certified functional
capacity examiner. (T. 118-31). The results from the FCE showed that plaintiff could
continuously sit for approximately 30 to 60 minutes and continuously stand and walk
for approximately 1 to 2 hours. (T. 118). Ms. Seager stated, however, that "[i]deally,"
plaintiff "should have the ability to alter positions frequently ... at will." (T. 118).
Plaintiff could also occasionally squat and kneel; frequently climb stairs; could engage
in simple grasping and pinching activities; and could engage in frequent light pushing
and pulling. (T. 118).

  The FCE stated some very specific lifting and carrying limitations. Plaintiff
could not "torso lift," but could lift 30 pounds from the floor to the waist occasionally,
with no frequent floor to waist lifting. (T. 118). He could occasionally lift 15 pounds
from his waist to his shoulder and frequently lift 5-10 pounds frequently. (T. 118).
Plaintiff could also occasionally lift 10 pounds from his shoulder to overhead and 5
pounds frequently. (T. 118). Finally, Ms. Seager noted that plaintiff could carry 30
pounds occasionally and 10 pounds frequently. (T. 118). Ms. Seager stated that

plaintiff's "[c]urrent abilities are consistent with full time employment at a light PDC. ... ."[2] (T. 119).

On July 9, 2001, plaintiff underwent another MRI of his lumbar spine by Dr. Rosenblum. (T. 97). Dr. Rosenblum concluded that plaintiff had a "slight degeneration of the L5-S1 intervertebral disk with disk desiccation and slight central posterior bulging of the annulus with a central annular rent." (T. 97). Plaintiff underwent a fourth MRI of his lumbar spine on March 12, 2002, by Dr. Rosenblum. (T. 96). Dr. Rosenblum's conclusions were that plaintiff suffered from a "[m]ild chronic degenerative change of the L5-S1 intervertebral disk" and a "[m]ild central posterior bulging of the annulus which ... is not neurocompressive." (T. 96).

On April 22, 2002, plaintiff was given a second FCE by Ms. Seager. (T. 103-117). The results from this FCE showed that plaintiff could continuously sit for approximately 30 minutes and continuously stand and walk for approximately 30 minutes. (T. 103). Ms. Seager again stated that "[i]deally," plaintiff "should have the ability to reposition/alternate positions frequently ... at will." (T. 103). Plaintiff could also frequently squat; occasionally kneel; but should never crawl or balance. (T. 103).

Plaintiff could occasionally climb stairs; frequently engage in "light push/ pull activities; and "occasional moderate push/pull activities"; and could engage in simple grasping and pinching activities. Ms. Seager stated that plaintiff could perform both low and high speed assembly tasks and operate arm controls without restriction "as

---

[2] PDC is an acronym for Physical Demand Classification and appears to correspond to Residual Functional Capacity (RFC). *See* (T. 129).

long as positional tolerances are taken into account." (T. 103).

Ms. Seager again stated very specific lifting abilities.  She separated lifting restrictions into ability to lift from floor to waist; leg lift; waist to shoulder; and shoulder to overhead. (T. 103).  The findings were slightly different from the 2001 evaluation.  She still stated that plaintiff could not engage in "torso lifts" from floor to waist, but could leg lift and partial squat 30 pounds occasionally and 10-15 pounds frequently.  She also stated that plaintiff could lift 25 pounds from waist to shoulder occasionally and 10-15 pounds frequently. (T. 103).  She stated that plaintiff could occasionally lift 20 pounds and frequently lift 10 pounds from his shoulder to overhead.  Plaintiff could carry 25 pounds occasionally and 10-15 pounds frequently for a distance of 30 feet. (T. 103).  Plaintiff could engage in "more constant" lifting of 5 pounds or less. (T. 103).   Ms. Seager concluded that although plaintiff could not perform his former work, plaintiff's "[c]urrent abilities appear consistent with full time employment at up to a light PDC. ... ." (T. 104).

The transcript also contains medical records from Southern New York Neurosurgical Group, P.C. (T. 133-63).  Plaintiff was referred to neurologist, Dr. Rida Mazaqri by his treating primary care physician, Dr. Martin Masarech. (T. 160). Between January of 2000 and July of 2002, plaintiff was examined many times by Dr. Rida Mazaqri, Dr. Saeed A. Bajwa, and other medical professionals[3] in this neurological group. (T. 133-63).  In 2001, Dr. Bajwa performed Intradiscal

---

[3] Some of the reports are signed by Nurse Practitioners or Physician's Assistants "for" the doctors. *See e.g.* (T. 140, 150).

Electrodermal Therapy at L5-S1. (T. 139-40)(post-operative report written by Joseph DeLappi, R.P.A. for Dr. Bajwa).  On November 14, 2001, plaintiff reported that he had noticed improvement in his pain. (T. 138).

On December 18, 2001, plaintiff reported that his left leg pain was completely improved and his right leg was also significantly better. (T. 137).  He still had intermittent pain in the lower lumbar region coming into the right buttock and to some extent in the left, however, plaintiff reported that the most bothersome symptom was numbness in his feet. (T. 137).  Plaintiff's lumbosacral range of motion was mildly restricted in lateral rotation and lateral bending.  Dr. Bajwa recommended that plaintiff continue using his brace, his TENS unit, and continue physical therapy. (T. 137).  Dr. Bajwa also noted that plaintiff was not taking "any narcotics at this time." (T. 137).

On February 19, 2002, Dr. Bajwa recommended a YMCA reconditioning program and stated that although plaintiff had not been able to return to work, he was plaining to start a VESID job retraining program. (T. 136).  On July 5, 2002, Dr. Bajwa stated that plaintiff had been examined by another neurologist, Dr. Aamir Rasheed, who did not find evidence of peripheral neuropathy. (T. 133).  Plaintiff's lumbosacral range of motion was still mildly restricted in lateral rotation and lateral bending, but Dr. Bajwa could not detect any focal motor or sensory deficits. (T. 133).  Dr. Bajwa stated that plaintiff was in college for retraining, was going to "follow-up" with Dr. Rasheed, and would "remain out of work and ***disabled from his previous job***." (T. 133)(emphasis added).

There are reports from Dr. Rasheed, from May 28, 2002 to February 11, 2003.

9

(T. 205-16).  On February 11, 2003, Dr. Rasheed found that plaintiff had "small fiber

sensory neuropathy," but that the etiology of his neuropathy was unknown. (T. 205).

Dr. Rasheed stated that it was not unusual for the EMG to be normal in the presence of

small fiber neuropathy, however, "at the same time," plaintiff's EMG did not reveal

any evidence of lumbosacral neuropathy or plexopathy, and there was no evidence of

nerve damage "per se" on the EMG and Nerve Conduction studies. (T. 205).  Dr.

Rasheed did not make a future appointment for plaintiff. (T. 205).

On February 27, 2003, plaintiff underwent a consultative examination at

Riverfront Medical Services at the request of the Workers' Compensation Board.[4]  (T.

166-69).  The results from the examination showed that plaintiff sat and stood

comfortably, walked with a normal gait, and was able to get up from a chair without

difficulty. (T. 167).  The examination results showed no focal muscle spasm; straight

leg raising was negative to 90 degrees; no focal motor weakness, atrophy, or

fasciculations; and plaintiff could "heel and toe walk without difficulty." (T. 167).

Moreover, although plaintiff complained of burning in his feet, "light touch, vibratory

sensation and pinprick all appear[ed] to be grossly intact."  (T. 167).

The examining physician concluded that plaintiff's injury was considered

"mild" under the New York State Workers' Compensation Board guidelines, a finding

that made the prognosis "reasonably good for this gentleman to return to be productive

in the work force." (T. 168).  Nonetheless, the examining physician further concluded

that plaintiff's condition was "a permanent one with restrictions on heavy lifting,

---

[4] It is unclear who performed this evaluation because it is unsigned.

10

prolonged bending and stooping" and adopted Ms. Seager's recommendation from the May 2001 FCE, limiting the amount of weight he could carry to 15 pounds. (T. 168). The examining physician deemed this weight limitation "to be permanent." (T. 168). The physician concluded that "I think he is capable of returning to light duty work as defined by the FCE." (T. 169).

On July 21 , 2003, plaintiff was examined by Dr. Martin Masarech, plaintiff's treating primary care physician. (T. 164). Dr. Masarech's report notes that plaintiff was still having pain in his lower back, thereby requiring him "to use his TENS unit when he is sitting for any length of time." (T. 164). Moreover, plaintiff needed to frequently shift positions when he is sitting. (T. 164). Dr. Masarech even noted that "[a]fter about 10 minutes sitting on the table he had to get up and stretch his back." (T. 164).

On October 6, 2004, plaintiff was examined by Mark Henderson, D.O., who is a consulting osteopath. (T. 170-74). Dr. Henderson found that plaintiff had some decreased range of motion in the lumbar spine as well as some evidence of lumbar spasm [including] a possible right sacroiliac joint dysfunction" [and] "decreased sensation from the knees to the distal toes bilaterally ... ." (T. 173). Dr. Henderson concluded that plaintiff "would have a mild restriction for heavy lifting and carrying" and "a mild restriction for prolonged standing [and] prolonged sitting." (T. 173).

After the ALJ's decision, plaintiff's attorney submitted additional evidence . (T. 237-47). This evidence included a December 6, 2005 sworn declaration from Dr. Masarech. (T. 246-47). In his declaration, Dr. Masarech stated that he had been

11

treating plaintiff for years. (T. 246). He also referred to Ms. Seager's April 2002 FCE and adopted it with certain restrictions, namely that plaintiff should not squat or kneel, should not lift more than 20 pounds at any time, and "carrying should never be more than occasional." (T. 246).

## DISCUSSION

### 1.   Disability Standard

To be considered disabled, a plaintiff seeking disability insurance benefits or SSI disability benefits must establish that he is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months ...." 42 U.S.C. § 1382c(a)(3)(A). In addition, the plaintiff's

> physical or mental impairment or impairments [must be] of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 1382c(a)(3)(B).

The Commissioner uses a five-step process, set forth in 20 C.F.R. §§ 404.1520 and 416.920 to evaluate disability insurance and SSI disability claims.

> First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability

12

to basic work activities.  If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which meets or equals the criteria of an impairment listed in Appendix 1 of the regulations.  If the claimant has such an impairment, the [Commissioner] will consider him disabled without considering vocational factors such as age, education, and work experience; ... .  Assuming the claimant does not have listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work.  Finally, if the claimant is unable to perform his past work, the [Commissioner] then determines whether there is other work which the claimant can perform.

*Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982); *see* 20 C.F.R. §§ 404.1520, 416.920.

The plaintiff has the burden of establishing disability at the first four steps. However, if the plaintiff establishes that his impairment prevents him from performing his past work, the burden then shifts to the Commissioner to prove the final step.  *Bluvband v. Heckler*, 730 F.2d 886, 891 (2d Cir. 1984).

## 2.   **Scope of Review**

In reviewing a final decision of the Commissioner, a court must determine whether the correct legal standards were applied and whether substantial evidence supports the decision.  *Rosado v. Sullivan*, 805 F. Supp. 147, 153 (S.D.N.Y. 1992) (citing *Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987)).  A reviewing court may not affirm an ALJ's decision if it reasonably doubts whether the proper legal standards were applied, even if the decision appears to be supported by substantial evidence.  *Johnson*, 817 F.2d at 986.  In addition, an ALJ must set forth the crucial factors justifying his findings with sufficient specificity to allow a court to

determine whether substantial evidence supports the decision.  *Ferraris v. Heckler*, 728 F.2d 582, 587 (2d Cir. 1984).

A court's factual review of the Commissioner's final decision is limited to the determination of whether there is substantial evidence in the record to support the decision.  42 U.S.C. § 405(g); *Rivera v. Sullivan*, 923 F.2d 964, 967 (2d Cir. 1991).  "Substantial evidence has been defined as 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Williams on behalf of Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988)(citations omitted). It must be "more than a scintilla" of evidence scattered throughout the administrative record.  *Richardson v. Perales*, 402 U.S. 389, 401 (1971)(quoting *Consolidated Edison Co. v. NLRB*, 197 U.S. 229 (1938)).

"To determine on appeal whether an ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams*, 859 F.2d at 258. However, a reviewing court cannot substitute its interpretation of the administrative record for that of the Commissioner if the record contains substantial support for the ALJ's decision.  *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).  *See also Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982), *cert. denied*, 459 U.S. 1212 (1983).

**3.    Residual Functional Capacity**

In rendering a residual functional capacity (RFC) determination, the ALJ

must consider objective medical facts, diagnoses and medical opinions based on such facts, as well as a plaintiff's subjective symptoms, including pain and descriptions of other limitations. 20 C.F.R. §§ 404.1545; 416.945.  *See Martona v. Apfel*, 70 F. Supp. 2d 145, 150 (N.D.N.Y. 1999)(citing *LaPorta v. Bowen*, 737 F. Supp. 180, 183 (N.D.N.Y. 1990)).  An ALJ must specify the functions plaintiff is capable of performing and may not simply make conclusory statements regarding a plaintiff's capacities.  *Verginio v. Apfel*, 1998 WL 743706 (N.D.N.Y. Oct. 23, 1998); *LaPorta v. Bowen*, 737 F. Supp. at 183.

In this case, plaintiff argues that the ALJ's residual functional capacity finding is inconsistent with the medical evidence. (Brief, p. 8-11).  Plaintiff argues that the ALJ took Ms. Seager's finding that plaintiff could perform "light work" as conclusive without considering the actual restrictions that she imposed, which are not consistent with the Commissioner's definition of "light work."  (Brief, p. 8-9).  The Commissioner's definition of light work is as follows:

> Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities.

20 C.F.R. § 404.1567(b).  Social Security Ruling 83-10 further clarifies "light work" as requiring "standing or walking, off and on, for a total of approximately 6

hours of an 8-hour workday." It has been held that the need to alternate positions frequently may be inconsistent with an ability to perform the full range of light work. *See Dennis v. Astrue*, 06-CV-6440, 2007 U.S. Dist. LEXIS 32409, *3 (W.D.N.Y. May 1, 2007)(citing Social Security Ruling 83-12, 1983 WL 31253 at *4 (SSA 1983); *Gravel v. Barnhart*, 360 F. Supp. 2d 442, 449 (N.D.N.Y. 2005)).

Ms. Seager concluded in both her 2001 and her 2002 FCE evaluations that plaintiff could perform "light work." (T. 103, 118). The ALJ appears to have relied upon the statement that plaintiff could perform "light work" and based his opinion, in part, upon these FCE evaluations. (T. 16). The ALJ cited both of the evaluations in his opinion. (T. 13, 14). The ALJ also specifically notes in his decision that in 2002, Ms. Seager "reported further restrictions in the claimant's continuous sitting tolerance, indicating that the claimant could only sit for 30 minutes at a time." (T. 14).

The ALJ did not, however, mention that Ms. Seager's additional limitations also referred to plaintiff's ability to continuously stand and walk, a very important factor in the ability to do light work. Social Security Ruling 83-10 states that in order to be able to perform light work, an individual must be able to ***stand or walk 6 hours in an 8-hour workday***. In making his conclusion regarding plaintiff's RFC, the ALJ did not resolve this ***important inconsistency***, nor did he state why he was apparently rejecting this portion of Ms. Seager's FCE evaluations while accepting other portions of the evaluations.

As stated above, Ms. Seager's 2002 evaluation differs slightly from her

16

2001 evaluation in the amount of time that she states that plaintiff can continuously sit, stand, and walk. (T. 103, 118).  In 2001, Ms. Seager stated that plaintiff could continuously sit for 30-60 minutes and his continuous standing/walking tolerance was 1-2 hours. (T. 118).  She also stated that "*[i]deally*, Mr. Zimmerman should have the ability to alter positions at will." (T. 118)(emphasis added).  In 2002, she stated that plaintiff's continuous sitting, standing, and walking tolerances were only 30 minutes, but she again stated that "*[i]deally*" plaintiff should have the opportunity to change positions at will. (T. 103)(emphasis added).  The ALJ did not mention the differences in the two reports.

The court notes that the ALJ did not rely exclusively on Ms. Seager's FCE evaluations in determining that plaintiff could perform light work, but nothing that the ALJ cites supports his rejection of the critical parts of the FCE reports. (T. 16).  Ms Seager's evaluations are more specific regarding plaintiff's sitting, standing, and walking capabilities than any other evidence in the record.  The court would also point out that the examiner from Riverfront Medical Services adopted Ms. Seager's RFC as did plaintiff's treating physician, Dr. Masarech.[5] (T. 169, 246).

It is unclear what Ms. Seager means by "ideally" regarding plaintiff's ability to change positions "at will."  However, a review of the FCE evaluations shows that both the 2001 and the 2002 evaluations were supported by ***actual objective***

---

[5] In his declaration, Dr. Masarech actually imposed slightly greater restrictions on plaintiff's ability to squat or kneel and lift and carry, limiting prohibiting all squatting an kneeling as well as limiting lifting and carrying to not more than 20 pounds at any time. (T. 246).

*testing* of plaintiff's abilities (T. 105-17, 120-31), including a determination that plaintiff did not exhibit "symptom exaggeration" based on a specific test for determining whether plaintiff was exaggerating his symptoms and whether plaintiff was making the appropriate effort during the testing. (T. 119, 104). The ALJ's determination that plaintiff could perform "light work" is not supported by substantial evidence. Therefore, this case should be remanded for a proper determination of RFC.[6]

## 4.   **Vocational Expert**

It is undisputed in this case that plaintiff cannot return to his prior work. In an ordinary case, the Commissioner meets his burden at step five of the analysis by considering the Medical Vocational Guidelines, appearing in Appendix 2 of the Social Security Regulations, and referred to as the "Grids." 20 C.F.R. Part 404, Subpt. P, App. 2. *See Rosa v. Callahan*, 168 F.3d 72, 78 (2d Cir. 1999)(citing *Bapp v. Bowen*, 802 F.2d 601, 604 (2d Cir. 1986)). The Grids take into account the plaintiff's RFC, age, education, and prior work experience, and indicate whether the plaintiff can engage in substantial gainful work in the national

---

[6] The court notes that the only other RFC of record was completed by a non-examining Disability Analyst who is not a physician. (T. 177-82). This Disability Analyst states that his conclusion that plaintiff can perform light work is based upon Dr. Henderson's opinion that the plaintiff has a "moderate restriction for lifting and carying [sic]" and a '[m]ild restriction for prolonged standing and sitting." (T. 181). The analyst then states that Dr. Henderson's opinion "is adopted." (T. 181). The ALJ does not appear to have relied upon this opinion which is understandable since there is no indication of this individual's qualifications, is not based upon an examination of plaintiff, and does not even appear to be based upon the complete medical record. Reliance upon this report would have been improper. The court merely mentions this report as being in the record, and because the ALJ did not apparently rely upon it, the report is not relevant to this decision.

economy. *Rosa v. Callahan*, 168 F.3d at 78.

While the ALJ may generally rely exclusively on the Grids, this reliance is inappropriate where the ALJ determines that the Grids do not take into account the full extent of a plaintiff's physical, non-exertional, or mental limitations. *Id.* Where it is determined that these additional limitations significantly limit a plaintiff's ability to perform a full-range of a particular exertional category, the Commissioner must introduce the testimony of a Vocational Expert, or other similar evidence, in order to show that there are other jobs in the national economy that plaintiff can perform. *Id.* (citing *Bapp*, 802 F.2d at 603).

In this case, plaintiff argues that the Secretary failed to sustain his burden to show that there are sufficient jobs in the national economy that plaintiff can perform. (Brief, p. 13-15).  Given that the ALJ erred in determining that plaintiff can perform "light work" and the fact that plaintiff may have additional restrictions, indicating that he might not be able to perform the "full-range" of light work, this court must recommend remand for the ALJ to make the determination of whether a vocational expert is necessary after a proper determination of RFC is made.  If the ALJ determines that because of plaintiff's additional positional limitations, he is unable to perform the full range of any particular exertional category of work, then the ALJ must provide a vocational expert's testimony.

**5.**   **Credibility**

"An [ALJ] may properly reject [subjective complaints] after weighing the

objective medical evidence in the record, the claimant's demeanor, and other indicia of credibility, but must set forth his or her reasons 'with sufficient specificity to enable us to decide whether the determination is supported by substantial evidence.'" *Lewis v. Apfel*, 62 F. Supp. 2d 648, 651 (N.D.N.Y. 1999)(quoting *Gallardo v. Apfel*, No. 96 CIV 9435, 1999 WL 185253, at *5 (S.D.N.Y. March 25, 1999)).  To satisfy the substantial evidence rule, the ALJ's credibility assessment must be based on a two step analysis of pertinent evidence in the record.  *See* 20 C.F.R. §§ 404.1529, 416.929; *see also Foster v. Callahan*, No. 96-CV-1858, 1998 WL 106231, at *5 (N.D.N.Y. March 3, 1998).

First, the ALJ must determine, based upon the claimant's objective medical evidence, whether the medical impairments "could reasonably be expected to produce the pain or other symptoms alleged...." 20 C.F.R. §§ 404.1529(a), 416.929(a).  Second, if the medical evidence alone establishes the existence of such impairments, then the ALJ need only evaluate the intensity, persistence, and limiting effects of a claimant's symptoms to determine the extent to which it limits the claimant's capacity to work.  *Id*. §§ 404.1529(c), 416.929(c).

When the objective evidence alone does not substantiate the intensity, persistence, or limiting effects of the claimant's symptoms, the ALJ must assess the credibility of the claimant's subjective complaints by considering the record in light of the following symptom-related factors: (1) claimant's daily activities; (2) location, duration, frequency, and intensity of claimant's symptoms; (3) precipitating and aggravating factors; (4) type, dosage, effectiveness, and side

effects of any medication taken to relieve symptoms; (5) other treatment received to relieve symptoms; and (7) any other factors concerning claimant's functional limitations and restrictions due to symptoms. *Id*. §§ 404.1529(c)(3), 416.929(c)(3).

In this case, plaintiff argues that the ALJ failed to properly assess his credibility. (Brief, p. 15-18). In his opinion, the ALJ notes that plaintiff helps with cooking, cleaning, mowing the lawn, and carrying groceries into the house. (T. 15-16). The ALJ further notes that plaintiff occasionally hunts, occasionally fishes, and attends school full time. (T. 16). From these findings derived from plaintiff's testimony, the ALJ concludes that "the claimant's testimony regarding his standing and walking limitations [are] inconsistent with the medical evidence of record ... ." (T. 16].

The ALJ did not specify how he reached his conclusion that plaintiff's ability to conduct the above activities indicates an inconsistency with the medical evidence regarding his ability to stand and/or walk. Without such specificity, this Court is unable to conclude whether substantial evidence supports such a conclusion. *Lewis v. Apfel*, 62 F. Supp. 2d 648, 651 (N.D.N.Y. 1999)(quoting *Gallardo v. Apfel*, No. 96 CIV 9435, 1999 WL 185253, at *5 (S.D.N.Y. March 25, 1999)).

The court also notes that in the FCE evaluations completed by Ms. Seager, plaintiff was tested for "symptom exaggeration" as well as inappropriate illness behavior, and overreaction. (T. 119, 104). Although Ms. Seager concluded that

plaintiff's "sitting tolerance" was "slightly greater that verbally reported," she also stated that plaintiff made "excellent effort" throughout both examinations. *Id.* Therefore, remand is appropriate in order to allow the ALJ to properly analyze plaintiff's credibility.

**6.    Reversal or Remand**

The court notes that plaintiff requests reversal for calculation of benefits, and in the alternative, a remand for proper consideration of the evidence. (Brief at 18).  Where the record contains persuasive proof of disability and a remand for further consideration would serve no purpose, the court may order reversal for calculation of benefits. *Curry v. Apfel*, 209 F.3d 117, 124 (2d Cir. 2000). However, when there are gaps in the administrative record or the ALJ has applied an inappropriate legal standard, a remand to the Commissioner is required for proper evaluation of the evidence and application of the correct standards. *Pratts v. Chater*, 94 F.3d 34, 39 (2d Cir. 1996)(citations omitted).

In this case, the court does not find that there is "persuasive proof" of disability or that remand for further evaluation would serve no purpose.  Although the ALJ did not properly assess RFC or plaintiff's credibility, it is still true that the FCE examiner and the doctors in general believed that plaintiff could do some other type of work, although it is clear that plaintiff cannot return to his former occupation.  A vocational expert may be necessary to make this determination. Thus, this court must reverse and remand for further and proper evaluation of the evidence.

**WHEREFORE**, based in the findings above, it is

**RECOMMENDED**, that this case be **REVERSED and REMANDED** to the Commissioner pursuant to **SENTENCE FOUR** of 42 U.S.C. § 405(g) for further proceedings consistent with this recommendation

Pursuant to 28 U.S.C. § 636(b)(1), the parties have ten days within which to file written objections to the foregoing report.  Such objections shall be filed with the Clerk of the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW**.  *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(e).

Dated: May 8, 2007

_____
Hon. Gustave J. DiBianco
U.S. Magistrate Judge

23